THIRD DIVISION 

July 28, 1999

No. 1-97-3627

JUDY CARL,

Plaintiff-Appellant,

v.

SHELLY RESNICK,

Defendant-Appellee.

)

)

)

)

)

)

)

)

)

Appeal from the

Circuit Court of

Cook County

Honorable

Kathy M. Flanagan,

Judge Presiding.

MODIFIED ON DENIAL OF PETITION FOR REHEARING

*JUSTICE McBRIDE delivered the opinion of the court:

On November 19, 1995, plaintiff Judy Carl was riding her horse on a trail in the Cook County Forest Preserve.  Defendant Shelly Resnick and her friend, Kathy Paddock, both on horses owned by defendant, were riding in the opposite direction.  All three riders stopped to talk when they passed along the trail.  At some point, the horse upon which Paddock was riding pinned its ears back, turned its body toward plaintiff's horse, and kicked plaintiff and her horse.  One hoof struck plaintiff's leg, causing her injury.

On February 13, 1997, plaintiff filed her first amended complaint alleging both a violation of the Animal Control Act (510 ILCS 5/16 (West 1995)) and negligence.  Both parties filed 

*Justice McBride is participating in this decision in place of      Justice Marvin Leavitt who retired from the Appellate Court on     December 4, 1998.

motions for summary judgement.  The trial court denied plaintiff's motion for summary judgement on the Animal Control Act count and granted defendant's motion for summary judgement, based upon the Equine Activity Liability Act (Equine Act) (745 ILCS 47/1 
et
 
seq
. (West 1995)), on both counts.  Plaintiff now appeals.

Since the trial court found both counts of plaintiff's complaint barred by the Equine Act, we will first address the applicability of that Act to the instant cause of action.  We recognize this is an issue of first impression, no Illinois court having interpreted the Equine Act since it became effective on July 7, 1995.  Section 5 of the Equine Act sets forth the Act's purposes:

"The General Assembly recognizes that persons who participate in equine activities may incur injuries as a result of the risks involved in those activities.  The General Assembly also finds that the State and its citizens derive numerous economic and personal benefits from equine activities.  Therefore, it is the intent of the General Assembly to encourage equine activities by delineating the responsibilities of those involved in equine activities."  745 ILCS 47/5 (West 1995).

The "equine activities" sought to be "encourage[d]" are enumerated in section 10(c) of the Act:

"(c) 'Equine activity' means:

(1) Equine shows, fairs, competitions, performances, or parades that involve any or all breeds of equines and any of the equine disciplines, including, but not limited to, dressage, hunter and jumper horse shows, grand prix jumping, 3 day events, combined training, rodeos, driving, pulling, cutting, polo, steeplechasing, English and western performance riding, endurance trail riding and western games, and hunting.

(2) Equine training activities, teaching activities, or both.

(3) Boarding equines.

(4) Riding, inspecting, or evaluating an equine belonging to another, whether or not the owner has received some monetary consideration or other thing of value for the use of the equine or is permitting a prospective purchaser of the equine to ride, inspect, or evaluate the equine.

(5) Rides, trips, hunts, or other equine activities of any type however informal or impromptu that are sponsored by an equine activity sponsor.

(6) Placing or replacing horseshoes on an equine."  745 ILCS 47/10(c) (West 1995).

The Equine Act encourages these "equine activities" by providing an assumption of risk defense to defendants sued by plaintiffs injured while engaging in one of the above-listed activities.  Section 15 sets forth this defense:

"Each participant who engages in an equine activity expressly assumes the risk of and legal responsibility for injury, loss, or damage to the participant or the participant's property that results from participating in an equine activity ***."  745 ILCS 47/15 (West 1995).

In her motion for summary judgement, defendant did not argue that plaintiff was engaged in one of the six categories of activities listed in section 10(c) of the Equine Act at the time of her injury.  Rather, she argued plaintiff was "engage[d] in an equine activity" as defined in section 10(a).  Compare 745 ILCS 47/10(a) (West 1995) (defining "Engages in an equine activity") with 745 ILCS 47/10(c) (West 1995) (defining "Equine activity").  Section 10(a) defines "engages in equine activity" as "riding, training, assisting in medical treatment of, driving, or being a passenger upon an equine, whether mounted or unmounted, or assisting a participant."  745 ILCS 47/10(a) (West 1995).  It is true, as defendant asserts, that plaintiff falls within this definition, inasmuch as plaintiff was "riding *** an equine" when she was injured.  Nevertheless, we believe that section 10(a) was clearly intended to be read in conjunction with section 10(c)--

only those "riding *** an equine" (745 ILCS 47/10(a)) while participating in one of the six statutory categories of activities (745 ILCS 47/10(c)) assume the risk of their injuries.  Thus, in the present case plaintiff's complaint against defendant was not barred by the Equine Act unless plaintiff's recreational riding of her own horse on a public trail was one of the limited activities sought to be encouraged by the Act.

In her brief on appeal, defendant discusses only one of the categories of activities enumerated in section 10(c): "[r]iding, inspecting, or evaluating an equine belonging to another ***."  See 745 ILCS 47/10(c)(4) (West 1995).  We fail to see how the activity in which plaintiff was engaged prior to her injury in the instant case falls within this description.  While defendant's companion, Kathy Paddock, may have been "riding *** an equine belonging to another" (745 ILCS 47/10(c)(4)) at the time of the incident (she was riding a horse owned by defendant), 
there is no question that the plaintiff was riding her own horse at the time of her injury.

Section 10(c)(4) illustrates why we must reject defendant's assertion that the Equine Act was intended to bar any cause of action brought by a plaintiff injured while "riding *** an equine" as defined in section 10(a).  Such a broad interpretation of the Equine Act would render section 10 internally inconsistent.  As previously mentioned, section 10(c)(4) bars only those causes of action brought by plaintiffs injured while "riding *** an equine 
belonging to another
 ***."  745 ILCS 47/10(c)(4) (West 1995) (Emphasis added).  Similarly, section 10(c)(5) permits the assumption of risk defense to be raised against a plaintiff injured while riding an equine, but only in the event that the ride was "sponsored by an equine activity sponsor."  See 745 ILCS 47/10(c)(5) (West 1995) (equine activities include "[r]ides, trips, hunts, or other equine activities of any type however informal or impromptu 
that are sponsored by an equine activity sponsor
") (Emphasis added); see also 745 ILCS 47/10(d) (West 1995) (defining "equine activity sponsor").  Only by ignoring these two provisions could we adopt the expansive interpretation of the Equine Act urged by defendant.

Our Equine Act is very similar to other "Equine Activity Liability Acts" (EALAs) which have been enacted in many states.  See generally McEvoy, 
The Rise of Equine Activity Liability Acts
, 3 Animal L. 201 (1997); Centner, 
The New Equine Liability Statutes
, 62 Tenn. L. Rev. 997 (1995); Carmel, 
The Equine Activity Liability Acts
, 83 Ky. L.J. 157 (1994-95).  The vast majority of these EALAs would not apply to the recreational riding at issue here.  See 83 Ky. L.J. at 177 (noting only a small number of states have EALAs which encompass recreational horseback riding).  Had our Legislature intended to give our Equine Act such a broad reach, it could have easily done so.  North Carolina's EALA defines "equine activity" as "any activity involving an equine."  N.C. Gen. Stat. § 99E-1(3) (1997).  In Arkansas, "equine activity" includes "[r]ides, hunts, or other equine activities of any type, however informal or impromptu" (Ark. Code Ann. § 16-120-201(2)(E) (Michie 1997); see also Wyo. Stat. Ann. § 1-1-122(a)(4)(F) (Michie 1998)), while Vermont's EALA is even more succinct (see Vt. Stat. Ann. tit. 12, § 1039(a)(2)(C) (1996) ("equine activity" includes "[r]ides, trips, or hunts")).  See also Wis. Stat. Ann. § 895.481 (West 1998) ("equine activity" includes "[r]iding, training or driving an equine or being a passenger on an equine"); Conn. Gen. Stat. § 52-557p (1997) ("Each person engaged in recreational equestrian activities shall assume the risk and legal responsibility for any injury ***").  In the two cases we have found where plaintiffs were kicked by horses ridden by others and brought suit under an EALA identical to ours, both plaintiffs were engaged in "equine activities" as defined in section 10(c).  See 
Gautreau v. Washington
, 672 So. 2d 262 (La. Ct. App. 1996) (plaintiff kicked by another participant's horse during horse show); 
Muller v. English
, 472 S.E.2d 448 (Ga. Ct. App. 1996) (plaintiff kicked by another participant's horse during fox hunt).  In sum, we find that plaintiff in the present case was not engaged in an "equine activity," as defined in our Equine Act, at the time of her injury, and that her complaint, therefore, was not barred by that Act.  Since we have found the Equine Act inapplicable to plaintiff, we do not address plaintiff's contention that only "equine activity sponsors" and "equine professionals" (defendant admittedly not being either) are insulated from liability by the Act.  But 
cf
. 745 ILCS 47/20(b) (West 1995) (listing exceptions whereby "an equine activity sponsor, an equine professional, 
or any other person
" can still be held liable under the Act) (Emphasis added); 
Gautreau
, 672 So. 2d at 265 (finding availability of assumption of risk defense in similarly worded Louisiana statute not limited to "equine activity sponsors" and "equine professionals").

Having found that defendant's motion for summary judgement was erroneously granted, we next turn to plaintiff's argument that her motion for summary judgement on the Animal Control Act count should have been granted.  The Animal Control Act provides, in relevant part:

"If a dog or other animal, without provocation, attacks or injures any person who is peaceably conducting himself in any place where he may lawfully be, the owner of such dog or other animal is liable in damages to such person for the full amount of the injury sustained."  510 ILCS 5/16 (West 1995).

Defendant contends it is "obvious" that "[t]he Animal Control Act ceased to apply to equine injury cases on and after July 7, 1995, when the Illinois Legislature enacted the Equine Liability Act."  We disagree.  While the Equine Act will undoubtedly bar some actions which, prior to the Equine Act's enactment, would have been permitted under the Animal Control Act (
i.e.
, those in which the plaintiff was engaged in an "equine activity" at the time an injury contemplated by the Equine Act occurred), that does not render the Animal Control Act inapplicable to every equine injury case.  As one commentator has noted about EALAs and their relationship to pre-existing law:

"EALAs by definition apply only to incidents involving someone engaged in an equine activity.  Accordingly, cases involving the 'vicious propensity' of a horse to bite or to kick someone not engaged in some form of equine activity will continue to be litigated under the common law, completely unaffected by enactment of an EALA.  There is an abundance of cases involving people of all sizes and ages getting bitten or kicked by horses with which they have come into contact in a purely passive or accidental fashion ***.  Since such persons would not fall into the class of being a 'participant,' their cause of action would in no way be affected by the existence of an EALA, but would arise under common law."  83 Ky. L.J. at 159.

Thus, it follows that the Animal Control Act remains applicable in equine injury cases not governed by the Equine Act.  Where there is an alleged conflict between two legislative enactments, we must construe those statutes in a manner which avoids an inconsistency and gives effect to both enactments, where such a construction is reasonably possible.  
Lily Lake Road Defenders v. County of McHenry
, 156 Ill. 2d 1, 9, 619 N.E.2d 137 (1993).  

Having found the Animal Control Act not preempted by the Equine Act on the facts now before us, we turn to the merits of plaintiff's Animal Control Act count.  Defendant argues plaintiff assumed the risk of her injury, suggesting 
Clark v. Rogers
, 137 Ill. App. 3d 591, 484 N.E.2d 867 (1985), is dispositive.  In 
Clark
, the plaintiff agreed to help the defendant Rogers train stallions for horseshows.  The plaintiff was thrown from one of Rogers' stallions and injured.  The 
Clark
 court held that the plaintiff had assumed the risk of such injuries when she accepted employment with Rogers.  
Clark
, 137 Ill. App. 3d at 594.

Clark
, in our opinion, is not dispositive.  Essential to the court's holding in 
Clark
 was the employer-employee relationship between the plaintiff and the defendant:

"A different situation is presented when the plaintiff voluntarily enters into some relationship with the defendant knowing that the defendant will not protect him against future risks which arise from the relationship.  In such a case, the risk of harm is not created by the defendant but is inherent in the activity which the plaintiff has agreed to undertake.  The plaintiff is regarded as tacitly or impliedly agreeing to take his own chances such as where he accepts employment knowing that he is expected to work with a dangerous horse.  This form of the doctrine is generally referred to as 'primary' assumption of the risk."  
Clark
, 137 Ill. App. 3d at 594.

Such a relationship is entirely absent here.  Plaintiff appears to have had no prior relationship with either defendant or Paddock; the record suggests plaintiff met both women for the first time on the trail the day of the accident.  

Plaintiff argues that the doctrine of primary assumption of risk has no application outside employment and other contractual settings.  We note that cases interpreting the Animal Control Act appear to be inconsistent on this issue.  Compare 
Harris v. Walker
, 119 Ill. 2d 542, 547-48, 519 N.E.2d 917 (1988) (plaintiff who fell off horse rented from defendant and who had signed exculpatory agreement found to have no cause of action under the Animal Control Act) and 
Guthrie v. Zielinski
, 185 Ill. App. 3d 266, 272, 541 N.E.2d 178 (1989) (finding doctrine of assumption of risk inapplicable to plaintiff injured by her parents' dog in parents' house, since there was no evidence of a contractual or employment relationship between the parties) and 
Vanderlei v. Heideman
, 83 Ill. App. 3d 158, 162-63, 403 N.E.2d 756 (1980) (plaintiff assumed risk of getting kicked by a horse when he agreed to work as horseshoer) with 
Ennen v. White
, 232 Ill. App. 3d 1061, 1066, 598 N.E.2d 416 (1992) (no cause of action under Animal Control Act for a plaintiff who was thrown from a friend's horse and injured) and 
Malott v. Hart
, 167 Ill. App. 3d 209, 211, 521 N.E.2d 137 (1988) (plaintiff, an experienced cattleman, assumed risk of being trampled when he volunteered to help neighbor round up a herd of cattle). 

We believe these cases can be reconciled by examining not the relationship between the plaintiff and the defendant in each case but rather the relationship between the plaintiff and the injury-causing animal.  In all of these cases, the plaintiff can be viewed as having taken control or custody of the animal prior to being injured, thereby making the plaintiff an "owner" of the animal under the Animal Control Act.  As an "owner," the plaintiff would then no longer be a member of the class of persons protected by the Act, and the relationship between the plaintiff and the defendant becomes irrelevant.

This analysis was first applied in 
Wilcoxen v. Paige
, 174 Ill. App. 3d 541, 528 N.E.2d 1104 (1988)
.  In 
Wilcoxen
, the plaintiff operated a dog boarding and grooming business.  While under the plaintiff's control and care, the defendant's dog attacked and seriously injured the plaintiff.  When sued by the plaintiff under the Animal Control Act, the defendant argued that the plaintiff, by accepting care and control over the defendant's dog, had become an "owner" of the dog and was, therefore, precluded from bringing suit.  
Wilcoxen
, 174 Ill. App. 3d at 542.

The appellate court in 
Wilcoxen
 agreed.  The court looked to section 2.16 of the Animal Control Act, which defines "owner":

"'Owner' means any person having a right of property in a dog or other animal, or who keeps or harbors a dog or other animal, or who has it in his care, or acts as its custodian, or who knowingly permits a dog or other domestic animal to remain on or about any premise occupied by him."  510 ILCS 5/2.16 (West 1995).

By voluntarily accepting responsibility for controlling the defendant's dog, the plaintiff, according to the 
Wilcoxen
 court, placed herself within the definition of an "owner" under the Animal Control Act and, therefore, could not recover from the dog's legal owner.  
Wilcoxen
, 174 Ill. App. 3d at 543.

This court applied the same analysis in 
Hassell v. Wenglinski
, 243 Ill. App. 3d 398, 612 N.E.2d 64 (1993).  In 
Hassell
, the plaintiff was employed to care for the defendant's mother in the defendant's home.  One day, as a favor to the defendant, the plaintiff agreed to walk the defendant's dogs.  While walking the dogs, plaintiff tripped and fell after being yanked forward by the dogs.  The 
Hassell
 court focused on the relationship between the plaintiff and the dogs in framing the issue: "whether a person having control over an animal may maintain a cause of action under the Animal Control Act against the animal's legal owner for injuries sustained while the person has such control."  
Hassell
, 243 Ill. App. 3d at 399.

The court began by discussing older cases which focused on the contractual or employment relationship between the plaintiff and the defendant (e.g., 
Harris
, 119 Ill. 2d 542 (plaintiff rented horse from defendant), 
Clark
, 137 Ill. App. 3d 591 (defendant employed plaintiff), 
Vanderlei
, 83 Ill. App. 3d 158 (plaintiff employed as horseshoer)).  
Hassell
, 243 Ill. App. 3d at 400-1.  The 
Hassell
 court then noted the shift in focus which occurred in 
Wilcoxen
--despite a contractual relationship between the plaintiff and the defendant in that case, the 
Wilcoxen
 court emphasized that the plaintiff's relationship with the defendant's dog made her an "owner" under, and therefore unprotected by, the Animal Control Act.  
Hassell
, 243 Ill. App. 3d at 401; 
Wilcoxen
, 174 Ill. App. 3d at 543; see also 
Eyrich v. Johnson
, 279 Ill. App. 3d 1067, 1070-71, 665 N.E.2d 878 (1996) (where farmhand sued employer after he was bitten by a boar owned by employer but under farmhand's care, summary judgement in employer's favor properly granted since farmhand was an "owner" under the Act and therefore "clearly not the type of plaintiff that the legislature intended to protect ***"). 

Unlike the situation in 
Wilcoxen
, there was no contractual relationship in 
Hassell
 between the plaintiff and the defendant involving the animal which caused the plaintiff's injuries.  Nevertheless, the 
Hassell
 court refused to limit 
Wilcoxen
's "owner" analysis to employment or contractual settings:

"[N]either the legislative history of the Animal Control Act nor the reasoning of the 
Wilcoxen
 decision persuades us that it was incorrectly decided or that its rationale should be limited to cases in which the plaintiff and defendant have entered into a contractual relationship involving the animal causing the injury."  
Hassell
, 243 Ill. App. 3d at 401.

Thus, a plaintiff who assumes the role of an "owner" under the Animal Control Act loses the protections afforded by that Act regardless of any relationship to the defendant.  See 
Docherty v. Sadler
, 293 Ill. App. 3d 892, 897, 689 N.E.2d 332 (1997) (refusing to apply assumption of risk analysis to minor plaintiff who was taking care of defendant's dog at the time of his injury, since plaintiff was clearly an "owner" of dog under Animal Control Act); 
Meyer v. Naperville Manner, Inc.
, 262 Ill. App. 3d 141, 149, 634 N.E.2d 411 (1994) ("While we recognize that the assumption of risk is a strong underlying theme in these decisions (as expressed particularly in 
Harris
), it is evident that the plaintiffs were also not held in the class of persons protected by the Act because, in assuming control of the animal, they could no longer be realistically viewed as innocent bystanders who have in no way provoked the animals.  Alternatively, it can be said that one who voluntarily assumes control of the animal places himself in the position of the owner").

 In any event, plaintiff would not lose the protections of the Animal Control Act under either framework of analysis.  Plaintiff had neither the relationship with defendant ("assumption of risk" analysis) nor the relationship with the animal that injured her ("owner" analysis) necessary to justify judgement in defendant's favor under the Animal Control Act.  As earlier mentioned, plaintiff had no prior relationship with defendant, contractual or otherwise, which could have given rise to assumption of risk.  And as plaintiff never exercised care, control, or custody of 
the horse Paddock was riding prior to being kicked by it, plaintiff in no way falls within the definition of an "owner" under section 2.16.  See 510 ILCS 5/2.16 (West 1995).

Having found no basis for granting summary judgement in defendant's favor on the Animal Control Act count, we next examine whether plaintiff's motion for summary judgement under that Act should have been granted.  Summary judgment should be granted when the pleadings, depositions, and admissions, together with any affidavits, show there is no genuine issue as to a material fact and that the movant is entitled to judgment as a matter of law.  
Meyer
, 262 Ill. App. 3d at 150.  We review 
de
 
novo
 the trial court's ruling on a motion for summary judgement.  
Eyrich
, 279 Ill. App. 3d at 1069.

As previously stated, in order to prevail under section 16 of the Animal Control Act, a plaintiff must prove four things: (1) an injury caused by an animal owned by the defendant; (2) lack of provocation; (3) the peaceable conduct of the injured person; and (4) the presence of the injured person in a place where he has a legal right to be.  
Eyrich
, 279 Ill. App. 3d at 1069-70; 
Meyer
, 262 Ill. App. 3d at 147.  Defendant, relying on 
Wilcoxen
, 174 Ill. App. 3d 541, argues that Kathy Paddock, 
who was riding the defendant's horse at the time plaintiff was injured, was the sole "owner" of that horse for purposes of liability under the Animal Control Act.  In her petition for rehearing, defendant argues that this court has imposed liability upon her based solely on her status as the legal owner of the horse.

Initially we observe that, defendant's assertions to the contrary, the 
Wilcoxen
 court did not hold that at any given time there can be only one "owner" of an animal for liability purposes under the Animal Control Act.  In fact, it appears the court was operating with the opposite assumption in mind--that multiple individuals can be "owners" of an animal.  The 
Wilcoxen
 court noted the defendant's position that the plaintiff could not bring suit since "at the time of her alleged injuries she 
too
 was an 'owner' of the dog ***." (Emphasis added).  
Wilcoxen
, 174 Ill. App. 3d at 542.   Moreover, the court in 
Wilcoxen
 interpreted section 2.16 as authorizing joint liability--"the Act imposes penalties against 
not
 
only
 an animal's legal owner, 
but
 
also
 against anyone who places himself in a position of control akin to an owner." (Emphasis added). 
Wilcoxen
, 174 Ill. App. 3d at 543.   Nothing in 
Wilcoxen
 suggests that, had a third party been injured by the defendant's dog while in the plaintiff's care, he could not have sued both the defendant and the plaintiff as "owners" under the Animal Control Act.

Because there can be more than one owner under the Animal Control Act, we need not determine whether or not Paddock was an "owner" under the Act at the time of the incident.  Paddock was never made a party to this lawsuit by either the plaintiff or defendant.  Consequently, the only question before us is whether or not defendant was liable as an "owner" within the meaning of the Animal Control Act despite the fact that another person, Paddock, was riding the defendant's horse at the time of the incident.  As someone who had a "right of property" in the horse, defendant was clearly within the definition of owner found in the Animal Control Act.  See 510 ILCS 5/2.16 (West 1996).

Further, defendant was more than the mere legal owner of the horse at the time of the incident.  Although Paddock was riding defendant's horse, not only was defendant present when the incident occurred, but she testified in her deposition that she would never let anybody ride her horse without her being present.  When asked why not, she responded "[b]ecause she's mine.  I wouldn't ever send my horse out with anybody else besides me."  Defendant's testimony, in conjunction with her presence at the time of the incident and her legal ownership of the horse, clearly established that she maintained care, custody, and control of her horse to bring her within the definition of "owner" found in the Animal Control Act.

Defendant's reliance on 
Frost v. Robave
, 296 Ill. App. 3d 528, 694 N.E.2d 581 (1998), is misplaced.  In 
Frost
, not only was the legal owner named as a defendant in the lawsuit, but the owner's company, which was located in the same building where the incident occured, was also named as a defendant.  There, the court examined whether the defendant business, which was 
not
 the legal owner of a dog which had caused injury, had sufficient control over the dog to become a "keeper," and thus an owner, under the Animal Control Act.  A "keeper" is a person, 
other than the legal owner of an animal, who has an animal in his care, custody or control.  See 
Frost
, 296 Ill. App. 3d at 534.  Status as a keeper thus provides a basis for liability under the Animal Control Act in addition to liability for the legal owner.  
Frost
, 296 Ill. App. 3d at 533 (the Animal Control Act "applies to legal owners as well as anyone who keeps or harbors a dog."); see also 
Clark
, 137 Ill. App. 3d at 593 (noting that "the keeper of an animal as well as its owner can be held liable under the [Animal Control] Act.").  
The court in 
Frost
, 296 Ill. App. 3d at 534-36, found that the defendant business was not an "owner" or "keeper" of the dog where the injury did not occur on business premises and no one who worked for the business, aside from the dog's legal owner, exercised custody or control over the dog.  There is nothing in the court's reasoning in 
Frost
 that is at odds with our decision in the instant cause where defendant was both the legal owner of the horse and retained care, custody, and control sufficient to place her within the definition of "owner" under the Animal Control Act.

The only possible factual question which might remain would be whether plaintiff provoked Paddock's horse.  See 510 ILCS 5/16 (West 1995) ("If a dog or other animal, without provocation, attacks or injures any person ***").  Plaintiff points to defendant's deposition testimony, where defendant was asked whether plaintiff did anything to provoke Paddock's horse, to which defendant responded, "No."  While defendant did suggest numerous things which 
may
 have provoked her horse (the smell, color, etc., of plaintiff's horse), all such testimony was purely speculative.  
See generally 
Severson v. Ring
, 244 Ill. App. 3d 453, 457-58, 615 N.E.2d 1 (1993) (greeting or petting an animal does not generally constitute provocation); 
Smith v. Pitchford
, 219 Ill. App. 3d 152, 154, 579 N.E.2d 24 (1991) (plaintiff's mere presence on private property does not constitute provocation regardless of how the animal may interpret the plaintiff's movements).  Defendant apparently concedes the issue, not responding to this argument in her appellate brief.  Not only does she fail to argue the issue, but she acknowledges in her brief that "[t]he relevant facts in this case are not in dispute."  With such a concession, 
we find there was no genuine issue of material fact in this case which could have precluded the trial court from granting plaintiff's motion for summary judgement 
on the question of liability because we have found that defendant was an "owner" of an animal that injured plaintiff, that plaintiff did not provoke the defendant's horse, and that plaintiff was peaceably conducting herself in a place where she had a legal right to be. 

Accordingly, we reverse the trial court's order denying plaintiff's motion for summary judgement and enter summary judgement for plaintiff on Count I as to liability under the Animal Control Act (510 ILCS 5/16 (West 1995)).  We also reverse the order granting defendant's motion for summary judgement on Count II.  We hold that under the facts of this case, the Equine Activity Liability Act (745 ILCS 47/1 
et seq
. (West 1995)), does not apply.  Count I is remanded for a trial on the issue of damages.  Count II, the negligence count, is remanded for a trial on liability and damages.

Reversed and remanded with directions.

GORDON and BURKE, JJ., concur.