SANDY M. KUSH, Plaintiff-Appellant, v. LOUISE WENTWORTH, Defendant-Appellee.

Second District   No. 2—01—0877

Opinion filed May 29, 2003.

158

Daniel V. O'Connor, of Anesi, Ozmon, Rodin, Novak & Kohen, Ltd., of Chicago, for appellant.

Anthony V. Fanone, of Pollina, Grant & Gentry, of Lisle, for appellee.

JUSTICE O'MALLEY delivered the opinion of the court:

Plaintiff sued defendant seeking to recover damages for injuries that she suffered when defendant's horse kicked her while plaintiff and defendant were participating in a group horse ride. As amended, plaintiff's complaint contained three counts alleging, respectively, that defendant violated the Animal Control Act (510 ILCS 5/1 *et seq.* (West 2000)), that defendant was negligent, and that defendant's conduct was willful and wanton. Based on its ruling that the Equine Activity Liability Act (Act) (745 ILCS 47/1 *et seq.* (West 2000)) barred the first two counts of the complaint on their faces and that defendant's alleged conduct did not rise to the level of willful and wanton conduct, the trial court granted defendant's motion for summary judgment. Plaintiff timely appeals. We reverse with respect to counts I and II and affirm with respect to count III.

The pleadings and depositions reveal the following facts. On November 27, 1997, Thanksgiving Day, plaintiff and defendant were participants in a group horse ride (the Thanksgiving ride). A total of about 40 riders participated in the Thanksgiving ride. Before the ride, the riders assembled at the Fox Meadows Farms in Naperville. All the riders and the horses that they were riding left the stable together and proceeded to a trail that was in a nearby forest preserve. After reaching the trail, the riders split into two smaller groups of about 20 riders each. The riders referred to these smaller groups as the "fast group" and the "slow group." The pace of the slow group was mostly walking and trotting, with some cantering.

Plaintiff and defendant both rode with the slow group. Plaintiff and defendant were both experienced horse riders. Defendant's horse was named "Skip."

About two weeks prior to the Thanksgiving ride, defendant rode Skip on a trail ride with two other riders. During this prior ride, when one of the other horses tried to pass Skip on Skip's left, Skip kicked out with his hind legs at the other horse and may have grazed the other horse. According to defendant, this was the first time, in the more than a year that she had owned Skip, that Skip had kicked out at another horse.

About an hour after the start of the Thanksgiving ride, plaintiff and defendant had a brief conversation as they were riding. Defendant told plaintiff about the prior incident in which Skip kicked out at another horse. According to plaintiff, defendant sought advice as to possible corrective measures that defendant could take with Skip. During the conversation, defendant told plaintiff that she was riding in the slow group on the Thanksgiving ride because of Skip's prior "kicking out" incident. Defendant also vaguely recalled telling plaintiff

during the conversation that she had tied a red ribbon in Skip's tail before starting the Thanksgiving ride. According to defendant, she tied the red ribbon in Skip's tail as a precaution to warn other riders that Skip could kick out. Defendant acknowledged that when she returned to the stable after the Thanksgiving ride the red ribbon was no longer in Skip's tail. Defendant did not know how or when the red ribbon disappeared. Plaintiff denied that defendant told her about a red ribbon in Skip's tail. Plaintiff also denied that she ever saw a red ribbon in Skip's tail.

During the Thanksgiving ride, between 15 minutes and an hour after the conversation between plaintiff and defendant, plaintiff began to canter the horse she was riding. Plaintiff planned to pass three or four other horses that were in front of her. Skip was one of the horses that plaintiff intended to pass. While her horse was cantering, plaintiff approached Skip from behind and to Skip's left. When plaintiff was about three feet from Skip, Skip kicked out, striking plaintiff on the leg. Skip's kick broke plaintiff's leg.

In her discovery deposition, plaintiff testified that she was aware of three precautions that a rider could take with respect to a group ride if the rider's horse was a kicker. These precautions were (1) to put a red ribbon in the horse's tail; (2) to ride at the back of the group; and (3) to refrain from going on group rides. Plaintiff considered these precautions to be part of horse riding etiquette. Plaintiff opined that if defendant had taken any one of these precautions with respect to the Thanksgiving ride, Skip would not have been in a position to kick out and injure plaintiff. Prior to the Thanksgiving ride, plaintiff was not aware that Skip had any particular reputation as a dominant or aggressive horse.

In her discovery deposition, defendant testified that she had owned Skip since 1996 and that Skip was "not a very competitive horse." Defendant testified that, in view of Skip's prior kicking incident and because Skip was "being a handful" on the day of the Thanksgiving ride, she thought it would be safer to join the slow group for the Thanksgiving ride. Defendant explained that by "being a handful" she meant that Skip was feeling energetic. Defendant denied that she had any difficulty controlling Skip on the Thanksgiving ride. Defendant believed that she was being overly cautious by putting a red ribbon in Skip's tail before the ride.

In her discovery deposition, Birgitta Martin, whose husband is plaintiff's cousin, testified that she was a participant in the Thanksgiving ride and that she saw Skip kick plaintiff. Martin was riding in the slow group behind plaintiff when Skip kicked plaintiff. Prior to the kicking incident, Martin had observed Skip at various times through-

out the Thanksgiving ride. Martin testified that she never saw a red ribbon in Skip's tail at any time during the Thanksgiving ride. Before the Thanksgiving ride, Martin was not aware of Skip having a reputation as a kicker or a mean horse.

Plaintiff's complaint, as amended, sought damages from defendant for the injuries that plaintiff suffered as a result of Skip kicking her. The complaint contained three counts. Count I alleged that defendant was liable under section 16 of the Animal Control Act (510 ILCS 5/16 (West 2000)). Count II alleged that defendant was liable because she was negligent. Count III alleged that defendant was liable because she engaged in willful and wanton conduct that included, *inter alia,* defendant's failure to tag Skip as a "kicker"; failure to keep Skip at the back of the group; and failure to refrain from taking Skip on the Thanksgiving ride.

Defendant filed a motion for summary judgment. The trial court granted the motion, finding that the Act applied to bar recovery for plaintiff as to all three counts of her complaint.

Plaintiff filed a timely motion to reconsider. Plaintiff argued that defendant's conduct constituted willful and wanton conduct. Following a hearing on the matter, the trial court denied plaintiff's motion to reconsider.

On appeal, plaintiff contends that the trial court erred in granting summary judgment in favor of defendant. We review a trial court's grant of summary judgment *de novo. Morris v. Margulis,* 197 Ill. 2d 28, 35 (2001).

The trial court granted summary judgment on counts I and II because it found that the Act precluded liability on the part of defendant for negligent conduct. We ordered the parties to brief the issue of whether a defendant who is neither an "equine activity sponsor" nor an "equine professional" can properly avail herself of the Act's limitations on liability. The parties agree that, at the time of the incident in question, defendant was neither an equine activity sponsor nor an equine professional as defined by the Act.

In determining whether defendant can claim protection under the Act, we must interpret the Act strictly in favor of plaintiff because the Act is in derogation of the common law. At common law, a plaintiff could recover under a negligence theory for injuries sustained in the course of equine-related activities. *Meyer v. Naperville Manner, Inc.,* 285 Ill. App. 3d 187, 191-92 (1996). For this reason, to the extent that the Act precludes recovery under a negligence theory, it is a statute in derogation of the common law. Statutes in derogation of the common law are to be strictly construed in favor of persons sought to be subjected to their operation. *Chandler v. Illinois Central R.R. Co.,* 333

Ill. App. 3d 463, 470 (2002). Courts will read nothing into such statutes by intendment or implication. *Chandler*, 333 Ill. App. 3d at 470. Accordingly, we interpret the Act strictly in favor of plaintiff.

■ We now turn to the Act itself. Section 15 of the Act provides:

> "Each participant who engages in an equine activity expressly assumes the risk of and legal responsibility for injury, loss, or damage to the participant or the participant's property that results from participating in an equine activity, except in the specific situations as set forth in Section 20, when the *equine activity sponsor or equine professional* may be held responsible." (Emphasis added.) 745 ILCS 47/15 (West 2000).

Section 15 provides for an assumption of risk defense to liability and then provides that there are exceptions to that defense enumerated in section 20 that apply only to equine activity sponsors and equine professionals. 745 ILCS 47/15 (West 2000).

The limitation of the exceptions in section 20 to equine activity sponsors and equine professionals suggests that the Act was meant to apply only to those classes of persons. The "specific situations" set forth in section 20 include willful and wanton disregard for the safety of the participant and intentionally injuring the participant. 745 ILCS 47/15 (West 2000). If section 15 limits the liability of people other than equine activity sponsors and equine professionals, then persons who are neither equine activity sponsors nor equine professionals are immune from liability even where they intentionally injure a participant because the exceptions of section 20, according to section 15, apply only to equine activity sponsors and equine professionals. The legislature could not have intended this absurd result. See *People v. Swift*, 202 Ill. 2d 378, 385 (2002) ("In interpreting statutes, we must avoid constructions [that] would produce absurd results"). For this reason, at least when viewed in isolation, the only rational reading of section 15 is that it limits liability only for equine activity sponsors and equine professionals.

Our analysis is complicated, however, by section 20(b), which provides:

> "Except as provided in Section 15, nothing in this Act shall prevent or limit the liability of an equine activity sponsor, an equine professional, or *any other person* if the equine activity sponsor, equine professional, or person: [engages in one of several enumerated activities]." (Emphasis added.) 745 ILCS 47/20(b) (West 2000).

There are two problems. First, in contradiction to section 15, section 20(b) provides that its exceptions apply to "any other person" as well as to equine activity sponsors and equine professionals. 745 ILCS 47/20(b) (West 2000). Thus, section 15 and section 20(b) are inconsistent

as to whether section 20(b) applies to persons other than equine activity sponsors and equine professionals.

The second problem concerns the language in section 20(b), which provides: *"Except as provided in Section 15*, nothing in this Act shall prevent or limit liability \*\*\*." (Emphasis added.) 745 ILCS 47/20(b) (West 2000). This qualification, which excepts section 15 from the operation of section 20(b), creates a repeating loop of statutory reference. The problem is that sections 20(b) and 15 each provide that the other section controls. By the language "[e]xcept as provided in Section 15," section 20(b) provides that it is trumped by section 15. By stating that it applies "except in the specific situations set forth in Section 20," section 15 provides that it is trumped by section 20. The result is an infinite loop where section 20(b) defers to section 15 which defers to section 20 which defers back to section 15 and so forth.

Although this is an obvious drafting error, the language of section 20(b) is unclear even absent the statutory self-reference problem. If we ignore the fact that section 15 refers back to section 20, there is still the problem that section 20(b) excepts section 15 from section 20(b)'s general exceptions to anything in the Act that would prevent or limit liability. This is problematic because section 15 is the only section of the Act that prevents or limits liability. For this reason, section 20(b) is meaningful only if it is an exception to section 15. Section 20(b), however, expressly provides the opposite: section 15 is an exception to section 20(b).

This nonsense leads to one of two conclusions. First, the legislature may have meant the opposite of what it said. This suggestion has some appeal. If possible, a statute should be construed in a manner such that no term is rendered meaningless or superfluous. *M.A.K. v. Rush-Presbyterian-St. Luke's Medical Center*, 198 Ill. 2d. 249, 257 (2001). If we were to ignore the "[e]xcept as provided in section 15" language in section 20(b), this would give meaning to the rest of section 20(b) because it would modify section 15. Balanced against this, however, is the rule that a court, in its construction of a statute, must not depart from the statute's plain language by reading into it exceptions, limitations, or conditions that the legislature did not express. *People v. Ellis*, 199 Ill. 2d 28, 39 (2002).

The second possible conclusion is that section 20(b) was written as an exception to a section of the statute, besides section 15, that was either deliberately or inadvertently omitted from the final version of the statute. Section 20(b) would be meaningful if another section of the Act, other than section 15, prevented or limited liability. The Act's legislative history suggests that the Act was based on the Colorado equine statute. Colorado's equine statute, unlike the Act, contains a subsection that states:

"Except as provided in subsection (4) of this section, an equine activity sponsor, an equine professional, \*\*\* or any other person, \*\*\* shall not be liable for an injury or the death of a participant resulting from the inherent risks of equine activities \*\*\* and except as provided in subsection (4) of this section no participant nor participant's representative shall make any claim against, maintain any action against or recover from an equine activity sponsor, an equine professional \*\*\* or any other person for injury, loss, damage or death of the participant resulting from any of the inherent risks of equine activities \*\*\*." Colo. Rev. Stat. Ann. § 13—21—119(3) (West 1995).

No similar language is contained in the Act. Did the legislature inadvertently omit this language? Did the legislature deliberately omit this language but inadvertently leave in section 20(b)? Is the language in section 15 meant to replace the language from the Colorado statute? If so, does this mean that the legislature intended the Act to have a different effect than the Colorado statute? We propose no answers to these questions but pose them merely to illustrate the Act's lack of clarity.

*Carl v. Resnick*, 306 Ill. App. 3d 453, 458 (1999), a First District case cited by both parties, suggests in *dicta* that the Act applies to persons other than equine activity sponsors and equine professionals. For support, *Carl* cites *Gautreau v. Washington*, 672 So. 2d 262 (La. Ct. App. 1996), a case from Louisiana that, according to *Carl*, found the "availability of [the] assumption of risk defense in a similarly worded Louisiana statute not limited to 'equine activity sponsors' and 'equine professionals.' " *Carl*, 306 Ill. App. 3d at 458. *Carl* is wrong that the Louisiana statute is similarly worded. *Gautreau* explicitly based its conclusion that the Louisiana statute applies to persons other than equine activity sponsors or equine professionals on language that is similar to the language in the *Colorado* statute that we quoted in the previous paragraph. *Gautreau*, 672 So. 2d at 265. The Louisiana statute, like the Colorado statute, specifically stated that "any other person \*\*\* shall not be liable for any injury or the death of a participant resulting from the inherent risks of equine activities." La. Rev. Stat. Ann. § 9:2795.1(B) (West 1992). No similar language is contained in the Act. As a result, the *dictum* in *Carl* is unfounded.

■ Finally, unlike the Louisiana statute and unlike the Colorado statute, the Act imposes a duty on those who participate in equine activity. Section 15 provides that "it shall be the duty of each participant to act within the limits of the participant's own ability, to maintain reasonable control of the particular horse or horses at all

times while participating in an equine activity, to heed all posted warnings, to perform equine activities only in an area or in facilities designated by the horseman, and to refrain from acting in a manner that may cause or contribute to the injury of anyone." 745 ILCS 47/15 (2000). This statutory duty is little more than a polite suggestion if, as defendant suggests, all participants in equine activity are immune from liability for negligent conduct. We do not think that when the legislature created this duty it meant to simultaneously eliminate any potential liability for violating that duty.

For the foregoing reasons, we find the Act unclear as to whether it was meant to limit the liability of persons other than equine activity sponsors and equine professionals. Construing the Act strictly in favor of plaintiff, as we must because the Act is in derogation of the common law, we hold that the Act does not preclude negligence liability for persons other than equine activity sponsors and equine professionals. Accordingly, counts I and II of plaintiff's cause of action are not barred by the Act. The trial court correctly granted summary judgment on count III because the conduct alleged by plaintiff did not amount to willful and wanton conduct. Additionally, we hope that the legislature will take the time both to clarify the scope of the Act and to fix section 20(b). The judgment of the circuit court of Du Page County is reversed with respect to counts I and II and affirmed with respect to count III.

Affirmed in part and reversed in part; cause remanded.

GROMETER and CALLUM, JJ., concur.