# Illinois Official Reports

## Appellate Court

---

### *Perkinson v. Courson*, 2018 IL App (4th) 170364

---

| | |
|---|---|
| Appellate Court Caption | DEANNA L. PERKINSON, Plaintiff-Appellant, v. SARAH COURSON, Defendant-Appellee. |
| District & No. | Fourth District<br>Docket No. 4-17-0364 |
| Filed | March 12, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Jersey County, No. 15-L-31; the Hon. Eric S. Pistorius, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Timothy J. Chartrand, of Williamson, Webster, Falb & Glisson, of Alton, for appellant.<br><br>Amy L. Jackson and Samantha Dudzinski, of Rammelkamp Bradney, P.C., of Jacksonville, for appellee. |
| Panel | PRESIDING JUSTICE HARRIS delivered the judgment of the court, with opinion.<br>Justices Steigmann and Turner concurred in the judgment and opinion. |

**OPINION**

¶ 1    In August 2014, plaintiff, Deanna L. Perkinson, was kicked by a horse and injured. In December 2015, she filed a two-count complaint against the horse's owner, defendant Sarah Courson, alleging a violation of the Illinois Animal Control Act (510 ILCS 5/1 to 35 (West 2014)) (count I) and negligence (count II). Although plaintiff and defendant are Illinois residents, the incident at issue occurred in Missouri and the trial court determined Missouri law controlled the conflict. Following that determination, the court granted defendant's motion to dismiss count I of plaintiff's complaint and her motion for summary judgment as to count II. Plaintiff appeals, arguing the court erred in (1) ruling on defendant's motion to dismiss count I of the complaint because the motion was brought pursuant to the wrong statutory section, (2) finding Missouri law applied to the parties' controversy, and (3) finding defendant was entitled to summary judgment on count II of the complaint. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3    In her December 2015 complaint, plaintiff alleged that both she and defendant were Illinois residents. On August 29, 2014, they were horseback riding alongside one another on a public trail when plaintiff was kicked by the horse defendant was riding, which defendant owned. Plaintiff maintained she sustained permanent and disfiguring injuries to her right leg as a result of being kicked. In connection with count I of her complaint, alleging a violation of the Animal Control Act, plaintiff also asserted that at the time and place of her injury, she did not provoke defendant's horse, had been conducting herself peaceably, and was in a location where she had a legal right to be. Relative to count II, alleging negligence, plaintiff asserted defendant owed her a duty of care but breached that duty by (1) failing to warn plaintiff of the horse's violent propensity to kick others, (2) failing to properly train the horse, (3) riding too close to plaintiff and plaintiff's horse when knowing that her horse had a violent propensity to kick others, and (4) riding her horse contrary to industry and practice norms. Plaintiff further alleged that as a direct and proximate result of defendant's negligence, she was kicked by defendant's horse without provocation and injured.

¶ 4    In January 2016, defendant filed a motion to dismiss plaintiff's complaint. She first sought dismissal of count I pursuant to section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2014)). Specifically, defendant argued that the incident at issue occurred while the parties were on a horseback riding trip in Eminence, Missouri, and, as a result, Missouri law governed "the pending litigation." She further maintained that because count I of plaintiff's complaint was based entirely on Illinois statutory law, that count necessarily failed to state a claim upon which any relief could be granted and had to be dismissed. Defendant further sought dismissal of both count I and count II under section 2-619(a)(9) of the Code (735 ILCS 5/2-619(a)(9) (West 2014)). She argued plaintiff signed a " 'Release of Liability' " (Release) prior to horseback riding, which, under Missouri law, barred her claims.

¶ 5    In February 2016, plaintiff responded to defendant's motion, arguing Illinois law applied to both counts of her complaint. Further, she argued the Release referenced by defendant should be disregarded because defendant failed to attach a sworn or certified copy of the Release to her motion to dismiss. Plaintiff alternatively argued the Release was against Illinois public policy, vague, ambiguous, overbroad, and could not be relied upon by defendant who was "a non-party outside of the Release."

¶ 6 In March 2016, the trial court conducted a hearing on defendant's motion to dismiss. At the hearing, defendant withdrew the portion of her motion that sought dismissal pursuant to section 2-619 and proceeded only with the portion of her motion that sought dismissal of count I under section 2-615. Ultimately, the court granted defendant's motion to dismiss count I, holding as follows:

> "[I]n conflict of law cases the courts must determine which forum has the most significant contacts with the litigation. Further, there is a legal presumption that the law of the state where the injury occurred applies in determining the rights and liabilities of the parties unless Illinois has a more significant relation to the conflict. This court finds that *** plaintiff has failed to establish that Illinois has a more significant relationship to the conflict. As such, Count I, which is based on the [Illinois] Animal Control Act, is hereby dismissed."

¶ 7 In April 2016, plaintiff filed a motion to reconsider the trial court's ruling as to count I of her complaint. She argued the court erred in its application of existing law as the case authority cited by both parties heavily favored application of Illinois law rather than Missouri law. Additionally, plaintiff maintained the court erred by placing the burden on her to establish that Illinois had a more significant relationship to the matter, rather than on defendant, the moving party.

¶ 8 In June 2016, a hearing was conducted on plaintiff's motion to reconsider. In its written order, the trial court stated it had considered both plaintiff's motion and defendant's response and "noted, for the first time," that the question of which state's law to apply involved factual determinations regarding the nature of the parties' relationship, the planning of their trip to Missouri, and the training of defendant's horse while in Illinois. The court pointed out that no affidavits or deposition testimony had been presented by the parties and elected to "keep plaintiff's Motion to Reconsider under advisement until the[ ] facts or issues [could] be fleshed out during the discovery process."

¶ 9 In September 2016, plaintiff filed a supplemental brief to her motion to reconsider, and defendant filed a supplemental response. Plaintiff attached the depositions of both parties to her filing.

¶ 10 During her deposition, plaintiff testified she resided in Dow, Illinois, both at the time of the incident at issue and at the time of her deposition. She had known defendant since 2003. They met through mutual friends and were brought together through the activity of horseback riding. Plaintiff and her husband had also purchased defendant's house.

¶ 11 Plaintiff testified she engaged in horseback riding on and off since the age of five. She and her husband owned nine horses and were part of a group of friends that rode horses together. Plaintiff estimated that 20 to 25 people were in their group, including defendant. She further estimated that she and defendant went horseback riding together approximately five or six times a year. Within plaintiff's group of horseback riding friends, there were people that plaintiff was closer to and whom she would talk with about going on horseback riding trips. Plaintiff testified she was not close friends with defendant. She denied that they spent time socially at one another's homes or that they participated in any activities together other than horseback riding.

¶ 12 On examination by her own counsel, plaintiff testified that prior to August 2014, she considered defendant her friend. They had ridden horses together in Illinois and "hung out" at

the home of a mutual friend. Also, they had each other's telephone numbers and were Facebook friends.

¶ 13    In August 2014, individuals from plaintiff's horseback riding group went on a trip to Cross Country Trail Ride, LLC (Cross Country), in Eminence, Missouri. According to plaintiff, each year, Cross Country organized a trail ride event during Labor Day weekend. She had previously attended the event approximately six times. Plaintiff testified Cross Country provided its paying guests with a campsite, stalls for horses, entertainment, and food.

¶ 14    On August 28, 2014, plaintiff arrived at Cross Country with her husband, daughter, and stepdaughter. The family took four of their own horses and met up with other individuals from plaintiff's group of friends. Plaintiff stated she had not known whether defendant would be on the trip but saw defendant at Cross Country on the evening of her arrival.

¶ 15    Plaintiff acknowledged signing certain documents upon her arrival at Cross Country on August 28, 2014. She identified her signature on forms that were submitted as exhibits during her deposition and recalled signing similar forms during her previous visits to Cross Country. Plaintiff acknowledged that part of the form she signed was titled "Release of Liability" and instructed her to read before signing; however, plaintiff testified she did not read the form because she had driven a long distance to get to Cross Country and believed it "was just to register." Plaintiff admitted signing similar forms on behalf of her daughter and stepdaughter.

¶ 16    Plaintiff testified that prior to signing the Cross Country forms, she understood that there was a risk of injury when participating in horseback riding events, including falling off a horse or being kicked. Despite that risk of injury, she participated anyway. Further, plaintiff testified she would have proceeded with the trail ride at Cross Country if she had read the form she signed, which included a warning about the risk of injury when participating in horseback riding events and statements indicating she fully assumed the risks of participation. Plaintiff acknowledged that the form she signed used the phrase "other participants." She agreed that defendant would have been "another participant" in the activities at Cross Country.

¶ 17    On August 29, 2014, plaintiff, her family, and members of her group intended to take a six-hour trail ride on one of the "identified trails" at Cross Country. Plaintiff was riding a horse named Chester, and defendant was riding a horse named Little Bit. Plaintiff did not recall ever previously being around Little Bit. Further, she acknowledged consuming beer during the trail ride. Plaintiff stated she also observed that defendant was consuming alcohol and believed defendant was intoxicated. During a break on the trail ride, defendant told plaintiff that Little Bit "had kicked [defendant's] husband while her husband was in the pasture." She did not remember defendant telling her when the kick occurred or that the horse was in heat at the time. Plaintiff stated she did not notice anything concerning about Little Bit's behavior while horseback riding on the day of the incident.

¶ 18    At some point during the trail ride, plaintiff and defendant began riding next to one another and were talking. Plaintiff did not recall who approached whom or how long they rode next to each other. As they were riding together down a hill, defendant's horse kicked out with both of its rear legs and struck plaintiff on her right shin. Plaintiff did not know what caused the horse to kick. Following the kick, plaintiff had to be helped off her horse, and an ambulance was called to the scene. Plaintiff stated she had a broken bone in her shin and, ultimately, underwent two surgeries.

¶ 19    Plaintiff testified that during the trail ride defendant should have put a red ribbon on her horse's tail to warn others that her horse was known to kick. She asserted, however, that the

presence of a red ribbon would not have altered her own behavior. Additionally, plaintiff stated she returned to Cross Country for horseback riding after the August 2014 incident with defendant's horse. Although she did not plan on attending Cross Country's Labor Day event in 2016, she did plan to go to another location in Missouri for a Labor Day trail ride.

¶ 20   As stated, the record also contains defendant's deposition. Defendant testified she resided in Farina, Illinois, with her husband. She met plaintiff in 2003 through her former sister-in-law who was friends with plaintiff. Also, in 2013, plaintiff purchased defendant's house in Dow, Illinois. Defendant testified she advertised the sale of her house on Facebook and plaintiff "friended [her] on Facebook" and contacted her by telephone about the house. Defendant noted her phone number was in her advertisement. She was not aware of plaintiff having her phone number prior to the time she advertised the sale of her house. Defendant considered plaintiff to be an acquaintance rather than a friend, noting they only socialized through mutual friends and always went horseback riding in a group setting. She estimated that she went horseback riding with plaintiff twice a year since 2006 but did not recall whether all of those occasions were in Illinois.

¶ 21   Defendant testified she grew up around horses and regularly went horseback riding. Since 2003, she owned 11 different horses. Defendant stated someone else would train her horses to ride and then she "worked the tweaks out." Specifically, defendant stated she trained her horses, including Little Bit, to "neck rein," not to ride too close to other horses, and in "ground manners."

¶ 22   In 2012, defendant purchased Little Bit from one of the members of her horseback riding group of friends. She kept Little Bit at her farm in Farina, Illinois. In 2013, Little Bit was trained for 30 days in Kampsville, Illinois, by an individual named Samuel Kaufman. Thereafter, defendant took over. Defendant testified her training with Little Bit included going on several trail rides with other horses. She estimated Little Bit went on six trail rides before the Cross Country trail ride in August 2014. Defendant stated that, prior to August 2014, Little Bit kicked at another horse in a pasture while she was in heat. During that incident, Little Bit made contact with defendant's husband who "was in the way." Defendant denied that any other kicking incidents occurred prior to August 2014.

¶ 23   Defendant testified she had been to Cross Country eight times prior to August 2014. She always went to Cross Country with a group. Defendant recalled seeing plaintiff at Cross Country prior to 2014 but did not recall if they rode horses together. In August 2014, defendant was at Cross Country with her husband, mother, and father. During the August 29, 2014, trail ride, defendant rode Little Bit, who had not previously been on a trail ride at Cross Country.

¶ 24   Defendant acknowledged drinking alcohol on the trail ride but stated she did not know if she was intoxicated. She estimated she had less than six beers, the amount she typically packed in her cooler. Defendant denied noticing anything peculiar about Little Bit during the trail ride. However, she asserted she told all of the other horseback riders that she would stay toward the back of the group because Little Bit was young, she did not know whether the horse would kick, and defendant did not totally trust the horse. Defendant testified she trusted Little Bit enough to ride her with other people but "didn't trust that she maybe wouldn't kick."

¶ 25   Defendant described the incident involving plaintiff, stating they were coming down a hill side by side when Little Bit "trotted up ahead." She then heard plaintiff yell out and observed plaintiff reaching for her leg. Defendant estimated that she and plaintiff had been a little more than arm's distance apart and were having a conversation before the incident. She stated she

- 5 -

did not know why Little Bit kicked. In the fall of 2014, defendant sold Little Bit. She testified she was not comfortable with the horse, noting an occasion when Little Bit bucked her off after being "spooked" by cattle.

¶ 26 In October 2016, the trial court entered a written order finding no reason to reconsider its previous ruling and denying plaintiff's motion to reconsider. In so holding, the court noted it reviewed its prior decision and the parties' additional arguments. It stated the additional facts presented to it only further supported its decision to grant defendant's motion to dismiss.

¶ 27 In February 2017, defendant filed a motion for summary judgment as to count II of plaintiff's complaint, alleging negligence, as well as a memorandum of law in support of her motion. She alleged that based on the deposition testimony of plaintiff and defendant, no question of material fact existed and she was entitled to judgment in her favor as a matter of law. Defendant maintained plaintiff was unable to establish that defendant owed her a duty, arguing that plaintiff both implicitly and explicitly assumed the risks associated with horseback riding. Also, she argued that plaintiff's "testimony undermine[d] any and all proffered allegations of breach of duty."

¶ 28 Defendant attached the parties' depositions to her filing, as well as copies of the Cross Country documents plaintiff acknowledged signing. The documents included forms titled "RELEASE OF LIABILITY—READ BEFORE SIGINING [*sic*]," which provided as follows:

"In consideration of being allowed to participate in any way, including but not limited to trail riding, competing, officiating, working for, recreating in any fashion while visiting Cross Country Trail Ride, LLC, and its trail ride program, its related events and activities, I *** the undersigned, acknowledge, appreciate, and agree that;

1. The risk of injury from the activities involved in this program is significant, including the potential for permanent paralysis and death, and while particular skills, equipment, and personal discipline may reduce the risk, the risk of serious injury does exist; and,

2. I KNOWINGLY AND FREELY ASSUME ALL SUCH RISKS, both known and unknown, EVEN IF ARISING FROM NEGLIGENCE OF THE RELEASEES or others, and assume full responsibility for my participation; and,

3. I willingly agree to comply with the stated and customary terms of participation. If, however, I observe any unusual significant hazard during my presence or participation, I will remove myself from participation and bring such to the attention of the Company immediately; and,

4. I, for myself and on behalf of my heirs, assigns, personal representatives, and next of kin, HEREBY RELEASE, INDEMNIFY, AND HOLD HARMLESS CROSS COUNTRY TRAIL RIDE, LLC, officers, officials, agents and/or employees, other participants, sponsoring agencies, sponsors, advertisers, and, if applicable, owners and lessors of premises used for the activity ('Releasees'), WITH RESPECT TO ANY AND ALL INJURY, DISABILITY, DEATH, or loss or damage to person or property associated with my presence or participation, WHETHER ARISING FROM THE NEGLIGENCE OF THE RELEASEES OR OTHERWISE, to the fullest extent permitted by law.

5. Releasor expressly agrees that this release, waiver, and indemnity agreement is intended to be as broad and inclusive as permitted by the laws of the State of Missouri

and that if any portion thereof is held invalid, it is agreed that the valid portion shall, not withstanding, continue in full legal force and effect."

¶ 29 In March 2017, plaintiff filed a response to defendant's motion, and in April 2017 defendant filed a reply. Both parties relied on Missouri substantive law when addressing defendant's motion for summary judgment. In April 2017, the trial court also conducted a hearing in the matter and entered a written order granting defendant's motion. Although the court's written order did not specify the basis for its ruling, the court's oral comments at the hearing reflect that it relied upon the Release plaintiff signed at Cross Country. Specifically, it stated as follows:

"Based upon the Release and without going to what is otherwise, I think a factual question, I think the Release in and of itself is sufficient to provide a basis for [defendant's] Motion for Summary Judgment. It identifies itself as a release. It specifically tells the person who's signing it to sign it and [plaintiff] sign[ed] not only for herself, but for her underage children. It says 'please read this before you sign it[.'] It specifically addresses other participants. That's as strong of language as you can get. So based *** on that, and that alone, the court's [going to] grant the Motion for Summary Judgment."

¶ 30 This appeal followed.

¶ 31 II. ANALYSIS
¶ 32 A. Statutory Designation for Motion to Dismiss
¶ 33 On appeal, plaintiff first argues the trial court erred in granting defendant's motion to dismiss count I of her complaint, alleging a violation of the Animal Control Act, because it was brought under the wrong section of the Code. She notes defendant sought dismissal of count I pursuant to section 2-615 of the Code (735 ILCS 5/2-615 (West 2014)) but argues that, because defendant's motion "raised an affirmative, factual defense," it should have been brought pursuant to section 2-619 of the Code (735 ILCS 5/2-619 (West 2014)).

¶ 34 "A section 2-615 motion to dismiss challenges the legal sufficiency of a complaint based on defects apparent on its face." *Bueker v. Madison County*, 2016 IL 120024, ¶ 7, 72 N.E.3d 269. "The only matters to be considered in ruling on such a motion are the allegations of the pleadings themselves." *Illinois Graphics Co. v. Nickum*, 159 Ill. 2d 469, 485, 639 N.E.2d 1282, 1289 (1994). Conversely, "[a] motion to dismiss under section 2-619 [citation] admits the legal sufficiency of the plaintiff's claim, but asserts certain defects or defenses outside the pleading that defeat the claim." *In re Scarlett Z.-D.*, 2015 IL 117904, ¶ 20, 28 N.E.3d 776. Where grounds for dismissal do not appear on the face of the complaint, the section 2-619 motion must be supported by affidavit. 735 ILCS 5/2-619(a) (West 2014).

¶ 35 As noted, defendant sought dismissal of count I of plaintiff's complaint, arguing Missouri law applied to the parties' conflict and, as a result, plaintiff's claim asserting liability based solely on an Illinois statute—the Animal Control Act—could not stand. Defendant brought her motion under section 2-615 of the Code, and as stated, plaintiff argues defendant should have designated section 2-619.

¶ 36 Here, it appears defendant labeled her motion to dismiss count I with the wrong statutory section. Section 2-619(a)(9) of the Code provides for dismissal where "the claim asserted against defendant is barred by other affirmative matter avoiding the legal effect of or defeating

the claim." 735 ILCS 5/2-619(a)(9) (West 2014). "Affirmative matter" has been held to include "the basic issue as to which state's law is to apply to the action." *Ingersoll v. Klein*, 106 Ill. App. 2d 330, 336, 245 N.E.2d 288, 291 (1969), *aff'd*, 46 Ill. 2d 42, 262 N.E.2d 593 (1970); see also *Illinois Graphics*, 159 Ill. 2d at 487 (citing *Ingersoll*, 46 Ill. 2d at 42, for the proposition that a choice-of-law defense had "been considered 'affirmative matter' so as to negate completely the asserted claim").

¶ 37      Additionally, our supreme court has acknowledged that the conflict-of-law methodology "may raise factual issues." *Townsend v. Sears, Roebuck & Co.*, 227 Ill. 2d 147, 154, 879 N.E.2d 893, 898 (2007). Such factual issues are properly considered and addressed in the context of a section 2-619 motion to dismiss, where a trial court may consider pleadings, depositions, and affidavits when making its ruling (*Zedella v. Gibson*, 165 Ill. 2d 181, 185, 650 N.E.2d 1000, 1002 (1995)), rather than in the context of section 2-615 motion, where only the pleadings may be considered (*Illinois Graphics*, 159 Ill. 2d at 485).

¶ 38      Nevertheless, even if defendant improperly labeled her motion to dismiss count I, no reversible error occurred. We note plaintiff failed to object to the statutory designation in defendant's motion to dismiss. Thus, she has forfeited her challenge to that designation on appeal. *American National Bank & Trust Co. v. City of Chicago*, 192 Ill. 2d 274, 280, 735 N.E.2d 551, 554 (2000). Moreover, setting plaintiff's forfeiture aside, we note that a defendant's error in labeling a motion to dismiss is not fatal where the nonmoving party has suffered no prejudice. *Wallace v. Smyth*, 203 Ill. 2d 441, 447, 786 N.E.2d 980, 984 (2002). In this instance, plaintiff acknowledges that the trial court allowed the choice-of-law issue to be "fleshed out" through the discovery process. Further, the record shows the issue was given full and thorough consideration by the trial court. Thus, plaintiff had a sufficient opportunity to be heard, and we find no reversible error.

¶ 39                          B. Choice-of-Law Determination

¶ 40      Plaintiff next argues the trial court erred in finding Missouri law applied to the parties' conflict. She contends that a choice-of-law analysis and the facts applicable to that analysis support the conclusion that Illinois has a more significant relationship to her cause of action.

¶ 41      Initially, we note that a *de novo* standard of review applies to this issue. Such a standard is applicable on review of a dismissal under either section 2-615 or 2-619 of the Code. *Patrick Engineering, Inc. v. City of Naperville*, 2012 IL 113148, ¶ 31, 976 N.E.2d 318. Additionally, we apply a *de novo* standard when reviewing a trial court's choice-of-law determination. *Townsend*, 227 Ill. 2d at 154.

¶ 42      "A choice-of-law determination is required only when a difference in law will make a difference in the outcome." *Id.* at 155. Thus, "a choice-of-law analysis begins by isolating the issue and defining the conflict." *Id.* Here, the parties agree that conflicts exist between Missouri and Illinois law. Notably, they identify Missouri's lack of a statute that is equivalent to the Illinois Animal Control Act. If Illinois law applies, claimant can maintain the cause of action alleged in count I of her complaint, which is based on that Illinois statute; however, if Missouri law applies, count I of her complaint must be dismissed as it would state no cause of action upon which relief could be granted under Missouri law. Thus, we agree that a conflict exists that will result in a difference in outcome.

¶ 43      Next, when making a choice-of-law determination, "the forum court applies the choice-of-law rules of its own state." *Id.* Illinois has adopted the choice-of-law analysis

contained in the Restatement (Second) of Conflict of Laws (1971) (Second Restatement). *Townsend*, 227 Ill. 2d at 163-64. Under the Second Restatement, a presumption exists in favor of applying the law of the state where the injury occurred. *Id.* at 163. The presumption "may be overcome only by showing a *more* or *greater* significant relationship to another state." (Emphases in original.) *Id.* Specifically, section 146 of the Restatement provides as follows:

> "In an action for a personal injury, the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in [the Second Restatement] to the occurrence and the parties, in which event the local law of the other state will be applied." Restatement (Second) of Conflict of Laws § 146 (1971).

¶ 44    Once a court chooses the presumptively applicable law, it "tests" its choice against various "principles" and "contacts" as set forth in sections 6 and 145 of the Second Restatement. *Townsend*, 227 Ill. 2d at 164. Section 6(2) sets forth the following relevant factors for consideration:

> "(a) the needs of the interstate and international systems,
>
> (b) the relevant policies of the forum,
>
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
>
> (d) the protection of justified expectations,
>
> (e) the basic policies underlying the particular field of law,
>
> (f) certainty, predictability and uniformity of result, and
>
> (g) ease in the determination and application of the law to be applied." Restatement (Second) of Conflict of Laws § 6(2) (1971).

¶ 45    Additionally, section 145(2) sets forth the following "[c]ontacts to be taken into account in applying the principles of [section] 6":

> "(a) the place where the injury occurred,
>
> (b) the place where the conduct causing the injury occurred,
>
> (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
>
> (d) the place where the relationship, if any, between the parties is centered." Restatement (Second) of Conflict of Laws § 145(2) (1971).

The contacts set forth in section 145(2) "are to be evaluated according to their relative importance with respect to the particular issue." *Id.*

¶ 46    Practically, it makes no difference whether a court first considers the section 145(2) contacts or the section 6(2) general principles. *Townsend*, 227 Ill. 2d at 168. "In either case[,] the Second Restatement's goal is the same—to ensure that a court is not merely 'counting contacts,' and that each contact is meaningful in light of the policies sought to be vindicated by the conflicting laws." *Id.*

¶ 47    Here, plaintiff was kicked by defendant's horse while on a trail ride in Missouri. Thus, Missouri is "the state where the injury occurred," and a presumption exists in favor of applying Missouri law unless, as plaintiff argues, Illinois has a more significant relationship to the occurrence and the parties. In testing this presumption, we first consider relevant "contacts" as

set forth in section 145(2) of the Restatement.

¶ 48                                              1. *Section 145 Contacts*

¶ 49      The first contact for consideration is the place where the injury occurred. Restatement (Second) of Conflict of Laws § 145(2)(a) (1971). As discussed, plaintiff was kicked by defendant's horse in Missouri, and thus, that is where her injury occurred. Plaintiff maintains this factor is of minimal importance because the location of her injury was merely fortuitous in that the incident could just as easily have occurred in Illinois. To support her argument, plaintiff cites cases with fact scenarios that involve interstate travelers and motor vehicle accidents, which courts have determined could just as easily have occurred in another state. *Murphy v. Mancari's Chrysler Plymouth, Inc.*, 408 Ill. App. 3d 722, 727-28, 948 N.E.2d 233, 238 (2011); *Miller v. Hayes*, 233 Ill. App. 3d 847, 852, 600 N.E.2d 34, 38 (1992); *Schulze v. Illinois Highway Transportation Co.*, 97 Ill. App. 3d 508, 510-11, 423 N.E.2d 278, 280 (1981).

¶ 50      Specifically, in *Murphy*, 408 Ill. App. 3d at 723, the plaintiffs were Illinois residents who brought suit against an Illinois automobile dealer that sold them a vehicle after one of the plaintiffs was injured in a motor vehicle accident in Michigan. The trial court determined Michigan law applied to the liability and damages issues in the case, and the plaintiffs appealed. *Id.* at 724.

¶ 51      On review, the First District noted that, in the context of a choice-of-law analysis, "situations may exist where the place of injury is merely fortuitous and, therefore, not an important contact." *Id.* at 727. In the case before it, the court found that the injured plaintiff's presence in Michigan was not fortuitous because "[h]e was purposefully and voluntarily in Michigan, driving to his weekend home with the intention of staying there for several days." *Id.* However, it also determined that a purposeful presence in Michigan did not mean that the accident "could not have happened in Michigan fortuitously." *Id.* It pointed out that the cause of the accident had not been determined and "[t]he same type of accident and the same type of injuries could have just as easily happened in Illinois." *Id.* at 727-28. Thus, the court concluded the place of injury was not an important consideration in the context of the case before it. *Id.* at 728.

¶ 52      Defendant argues *Murphy* is distinguishable from the present case, and we agree. Notably, this case does not involve a motor vehicle accident that happened by chance in one state versus another. Instead, plaintiff's injury occurred at the planned destination of both parties. The specific location, Cross Country, focused on horseback riding activities in which both parties planned to engage. Additionally, both plaintiff and defendant had previously visited Cross Country on multiple occasions.

¶ 53      We note comment e of section 145 provides as follows:

> "In the case of personal injuries or of injuries to tangible things, the place where the injury occurred is a contact that, as to most issues, plays an important role in the selection of the state of the applicable law [citation]. *** This is so for the reason among others that persons who cause injury in a state should not ordinarily escape liabilities imposed by the local law of that state on account of the injury. ***
>
> Situations do arise, however, where the place of injury will not play an important role in the selection of the state of the applicable law. This will be so, for example, when the place of injury can be said to be fortuitous or when *for other reasons it bears*

*little relation to the occurrence and the parties with respect to the particular issue* ***.*" (Emphasis added.) Restatement (Second) of Conflict of Laws § 145 cmt. e (1971).

Under the facts of this case, we cannot say that the place of injury bears little relation to the occurrence or the parties. This is particularly true in light of the underlying issues presented in plaintiff's complaint, which almost exclusively involve the parties' behavior and conduct while horseback riding at Cross Country in Missouri. Therefore, we find this contact weighs in favor of applying Missouri law.

¶ 54 The next contact for consideration is the place where the conduct causing the plaintiff's injury occurred. Restatement (Second) of Conflict of Laws § 145(2)(b) (1971). An analysis of injury-causing conduct "includes all conduct from any source contributing to the injury," including a defendant's affirmative defenses or allegations of contributory negligence. *Townsend*, 227 Ill. 2d at 169.

¶ 55 Here, plaintiff acknowledges that, relative to count I, this factor favors application of Missouri law because "the place where the conduct causing the injury occurred would be the place where the animal caused injury without provocation." She asserts, however, that she alleged injury-causing conduct that occurred in both Illinois and Missouri in connection with count II and thus, this factor must be "deemed a wash." We disagree.

¶ 56 In count II, plaintiff asserted defendant was negligent for failing to warn plaintiff of the horse's violent propensity to kick, failing to properly train her horse, riding the horse too close to plaintiff, and failing to adhere to industry and practice norms while riding her horse. All but one of these alleged actions or inactions by defendant occurred exclusively in Missouri. Additionally, defendant has argued that plaintiff expressly assumed the risks associated with horseback riding at Cross Country and points to the Release plaintiff signed in Missouri. Given that the vast majority of relevant conduct occurred in Missouri, we find this factor weighs in favor of applying Missouri law to the parties' conflict.

¶ 57 The third contact for consideration is "the domicil, residence, nationality, place of incorporation and place of business of the parties." Restatement (Second) of Conflict of Laws § 145(2)(c) (1971). Here, both parties are Illinois residents and neither disputes that this factor weighs in favor of applying Illinois law.

¶ 58 The final contact for consideration is "the place where the relationship, if any, between the parties is centered." Restatement (Second) of Conflict of Laws § 145(2)(d) (1971). In this instance, the parties' relationship primarily arose from having a group of mutual friends in Illinois and engaging in horseback riding activities within that group. Plaintiff and defendant were riding horses together in Missouri at the time of the incident at issue but had previously ridden horses together in Illinois. Ultimately, we find this contact favors applying Illinois law, as most of the parties' interactions occurred within this state.

¶ 59 Here, the section 145(2) contacts are evenly split, with two favoring application of Missouri law and two favoring Illinois law. However, as noted, the 145(2) contacts "are to be evaluated according to their relative importance with respect to the particular issue." Restatement (Second) of Conflict of Laws § 145(2) (1971). In this case, the fact that the parties interacted with one another more frequently in Illinois has little to do with the issues presented by either count I or count II of plaintiff's complaint. Thus, we find the fourth factor set forth in section 145(2) is only minimally important to the underlying proceedings. As a result, the section 145(2) contacts, when considered alone, support rather than rebut the presumption in

favor of applying Missouri law. This does not end our analysis, however, and we must also consider the principles set forth in section 6 of the Second Restatement.

¶ 60                                                *2. Section 6 Principles*

¶ 61        As noted, section 6(2) of the Second Restatement sets forth the following principles for consideration when conducting a choice-of-law analysis:

> "(a) the needs of the interstate and international systems,
>
> (b) the relevant policies of the forum,
>
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
>
> (d) the protection of justified expectations,
>
> (e) the basic policies underlying the particular field of law,
>
> (f) certainty, predictability and uniformity of result, and
>
> (g) ease in the determination and application of the law to be applied." Restatement (Second) of Conflict of Laws § 6(2) (1971).

In this case, a detailed analysis of all seven section 6 principles is unnecessary because the principles set forth in sections 6(2)(a), 6(2)(d), and 6(2)(f) are only minimally implicated in a personal injury action. *Townsend*, 227 Ill. 2d at 169-70 (citing Restatement (Second) of Conflict of Laws § 145 cmt. b, at 415-16 (1971)). Therefore, we confine our analysis to the remaining section 6 principles. *Id.* at 170.

¶ 62        As stated, the parties agree that Illinois law conflicts with Missouri law based upon the existence of the Animal Control Act in Illinois and the lack of an equivalent Missouri statute. Initially, we consider this conflict in light of the relevant policies of Illinois (section 6(2)(b)), the relevant policies of Missouri and the relative interest of Missouri in the determination of the issue (section 6(2)(c)), and the basic policies underlying the particular field of law (section 6(2)(e)).

¶ 63        Under the Animal Control Act, "[i]f a dog or other animal, without provocation, attacks, attempts to attack, or injures any person who is peaceably conducting himself or herself in any place where he or she may lawfully be, the owner of such dog or other animal is liable in civil damages to such person for the full amount of the injury proximately caused thereby." 510 ILCS 5/16 (West 2014). Our supreme court has described the history behind the Animal Control Act and interpreted its provisions as follows:

> "The original version of this statute was passed in 1949 and applied only to dogs. [Citation.] The apparent purpose of the legislation was modest: to reduce the burden on dog-bite plaintiffs by eliminating the 'one-bite rule'—the common law requirement that a plaintiff must plead and prove that a dog owner either knew or was negligent not to know that his dog had a propensity to injure people. [Citation.]
>
> Enacting the Animal Control Act in 1973, the legislature amended this 'dog-bite statute' to cover 'other animals.' ***
>
> *** [W]e believe that the legislature intended only to provide coverage under the statute for plaintiffs who, by virtue of their relationship to the owner of the dog or other animal or the lack of any such relationship, may not have any way of knowing or avoiding the risk that the animal poses to them. This interpretation is consistent with

the emphasis the statute places on lack of provocation and plaintiff's peaceable conduct in a place in which he is legally entitled to be." *Harris v. Walker*, 119 Ill. 2d 542, 546-47, 519 N.E.2d 917, 918-19 (1988).

In *Harris*, the supreme court held the Animal Control Act was inapplicable to circumstances "where a person rents a horse and understands and expressly accepts the risks of using the horse." *Id.* at 547-48; *Johnson v. Johnson*, 386 Ill. App. 3d 522, 535, 898 N.E.2d 145, 159 (2008) ("[T]he common law defense of assumption of the risk has been recognized as a valid affirmative defense to an action brought pursuant to the Animal Control Act.").

¶ 64     As indicated by the parties, Missouri does not have a comparable statute. See Mo. Ann. Stat. § 273.036 (West 2014) (providing for strict liability in the event of dog bites but not applying to other animals). However, it has enacted the Equine Liability Act, for the purpose of codifying "the common law assumption of risk principle in the context of a specific recreational activity." *Frank v. Mathews*, 136 S.W.3d 196, 202 (Mo. Ct. App. 2004). That Act limits liability for injuries resulting from the inherent risks associated with equine activities, providing as follows:

> "[A]n equine activity sponsor, an equine professional, *** any employee thereof, *or any other person* or corporation shall not be liable for an injury to or the death of a participant resulting from the inherent risks of equine *** activities and, *** no participant or a participant's representative shall make any claim against, maintain an action against, or recover from an equine activity sponsor, an equine professional, *** any employee thereof, or *any other person* from injury, loss, damage or death of the participant resulting from any of the inherent risks of equine or livestock activities." (Emphases added.) Mo. Ann. Stat. § 537.325(2) (West 2014).

Under the Equine Liability Act, an "equine activity" includes "[r]ides *** sponsored by an equine activity sponsor." *Id.* § 537.325(3)(e). Further, an "equine activity sponsor" includes a group or corporation that "sponsors, organizes[,] or provides the facilities for, an equine activity." *Id.* § 537.325(4). The Equine Liability Act does not relieve covered individuals "from any duty that common law negligence principles impose upon them." *Frank*, 136 S.W.3d at 203.

¶ 65     Finally, we note that, although not significantly addressed by either party, Illinois has also adopted an Equine Activity Liability Act (Illinois Equine Act) (745 ILCS 47/1 *et seq.* (West 2014)). The legislature has set forth the purpose of the Illinois Equine Act as follows:

> "The General Assembly recognizes that persons who participate in equine activities may incur injuries as a result of the risks involved in those activities. The General Assembly also finds that the State and its citizens derive numerous economic and personal benefits from equine activities. Therefore, it is the intent of the General Assembly to encourage equine activities by delineating the responsibilities of those involved in equine activities." 745 ILCS 47/5 (West 2014).

The Fifth District of this court has noted that equine activity liability acts "have been enacted in more than 40 states since the mid-1980s" and are intended "to promote equine activities and the horse industry in general by limiting liability for some horse-related activities." *Smith v. Lane*, 358 Ill. App. 3d 1126, 1128-29, 832 N.E.2d 947, 950 (2005).

¶ 66     Here, plaintiff argues the policy behind the Animal Control Act "is more significant within the context of injuries by animals than the purpose of the Missouri Equine Liability Act." We

- 13 -

cannot agree. Clearly, Illinois has a policy, by way of the Animal Control Act, of protecting individuals who come into contact with an animal and are unable to appreciate or avoid the risks posed by the animal. However, both Missouri and Illinois have acknowledged that special circumstances exist with respect to horses and equine-related activities. Like Missouri law, Illinois law also contemplates that certain inherent risks are associated with equine activities like the sort of activity engaged in by the parties in this case. Both states have a policy of promoting equine activities and limiting liability associated with those activities. Both states also take into account assumption of risk principles with respect to horse-related injuries, even in the context of the Animal Control Act. Given these circumstances, we fail to see how Illinois policies are any "more significant" than those behind relevant Missouri law. Rather, both states appear to have similar policies and interests relative to injuries caused by horse-related activities.

¶ 67     In addressing the relevant policies and interests of both Illinois and Missouri, plaintiff also argues that Illinois has a significant interest in providing tort remedies to its injured citizens. She cites *Esser v. McIntyre*, 169 Ill. 2d 292, 300, 661 N.E.2d 1138, 1142 (1996), wherein the supreme court held that "[h]aving provided a legal means for a plaintiff to recover for injuries caused by a defendant's culpable conduct, Illinois has a strong interest in providing that remedy in disputes between Illinois residents." In so holding, the court noted that under the law of the place of injury in that case—Mexico—Illinois's interest would be circumvented because the plaintiff had no remedy against the defendant. *Id.* In fact, the parties had agreed that the plaintiff had no cause of action against the defendant under Mexican law. *Id.* at 297. The same cannot be said in this case, as plaintiff has a potential remedy under Missouri law in the form of a negligence cause of action. Further, we note that Missouri has a competing interest in having its laws apply to equine-related activities that occur within its borders.

¶ 68     Ultimately, we disagree with plaintiff that the policies and interests relevant to this matter weigh in favor of applying Illinois law. Therefore, plaintiff does not overcome the presumption in favor of applying Missouri law.

¶ 69     On review, plaintiff also addresses the principle relating to the "ease in the determination and application of the law to be applied." Restatement (Second) of Conflict of Laws § 6(2)(g) (1971). She maintains that because Illinois law is more advantageous to her claim, this principle weighs in favor of applying Illinois law. However, we agree with defendant that the purpose of section 6(2)(g) is to consider whether the competing laws are "simple and easy to apply" rather than which law is most beneficial to plaintiff. See Restatement (Second) of Conflict of Laws § 6 cmt. j (1971).

¶ 70     Relative to this principle, we note that the Illinois Equine Act may be applied to preempt the Animal Control Act in certain situations. See *Carl v. Resnick*, 306 Ill. App. 3d 453, 458-59, 714 N.E.2d 1, 5 (1999) (stating the Illinois Equine Act would bar actions in which the plaintiff was engaged in an " 'equine activity' " that would have previously been permitted under the Animal Control Act); *Smith*, 358 Ill. App. 3d at 1134 (stating that "had the [Illinois] Equine Act applied to the facts of the case, preemption would have barred an action for the same alleged injuries under the Animal Control Act"). However, the Illinois Equine Act has also been found to be "unclear as to whether it was meant to limit the liability of persons other than equine activity sponsors and equine professionals," *i.e.*, persons like defendant in this case. *Kush v. Wentworth*, 339 Ill. App. 3d 157, 165, 790 N.E.2d 912, 918 (2003). In *Kush*, the Second District of this court criticized the Illinois Equine Act for containing inconsistencies

and "obvious drafting error," as well as provisions that could lead to absurd results. *Id.* at 162-63. Given the lack of clarity of this state's equine activity liability act, we must find that consideration of whether the competing laws are "simple and easy to apply" also weighs in favor of applying Missouri law.

¶ 71 As discussed, a presumption exists in this case in favor of applying the Missouri law to the parties' conflict. We find nothing in either the parties' arguments or our review of the Second Restatement's relevant contacts and principles for consideration that overrides that presumption. Thus, we find no error in the trial court's finding that Missouri law applies to the underlying controversy.

¶ 72 In so holding, we note that plaintiff suggests it is unclear from the underlying proceedings whether the trial court's choice-of-law ruling was as to both counts of her complaint. We disagree. The court's order referred generally to "the litigation" or "the conflict" when holding Missouri law was applicable, and nothing in its orders indicates that its ruling was limited to only count I. Further, as plaintiff acknowledges, both parties proceeded as if Missouri law applied to count II by citing substantive law from that state in connection with filings related to defendant's motion for summary judgment. Therefore, we find plaintiff's assertion that the record is somehow unclear is without merit.

¶ 73                                   C. Motion for Summary Judgment

¶ 74 On appeal, plaintiff next argues the trial court erred in granting defendant's motion for summary judgment as to count II of her complaint. "Summary judgment is properly granted when the pleadings, depositions, admissions, and affidavits on file, viewed in the light most favorable to the nonmoving party, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Village of Bartonville v. Lopez*, 2017 IL 120643, ¶ 34, 77 N.E.3d 639. "If the plaintiff fails to establish any element of the cause of action, summary judgment for the defendant is proper." *Williams v. Manchester*, 228 Ill. 2d 404, 417, 888 N.E.2d 1, 9 (2008). The trial court's summary judgment ruling is subject to *de novo* review. *Schweihs v. Chase Home Finance, LLC*, 2016 IL 120041, ¶ 48, 77 N.E.3d 50.

¶ 75 To obtain relief in a negligence cause of action, " 'the plaintiff must establish that (1) the defendant had a duty to the plaintiff; (2) the defendant failed to perform that duty; and (3) the defendant's breach was the proximate cause of the plaintiff's injury.' " *Peters v. Wady Industries, Inc.*, 489 S.W.3d 784, 793 (Mo. 2016) (quoting *Martin v. City of Washington*, 848 S.W.2d 487, 493 (Mo. 1993)). In this case, both before the trial court and on appeal, defendant has argued that plaintiff cannot establish that defendant owed her a duty based on the Release plaintiff signed at Cross Country. The trial court's oral ruling reflects that it agreed with this argument and granted summary judgment in defendant's favor. For the reasons that follow, we also agree that plaintiff signed a valid and enforceable release of liability and expressly assumed the risks associated with the underlying horseback riding activities.

¶ 76 Under the "assumption of the risk doctrine" a person who "voluntarily consents to accept the danger of a known and appreciated risk[ ] *** may not sue another for failing to protect him from it." *Coomer v. Kansas City Royals Baseball Corp.*, 437 S.W.3d 184, 191 (Mo. 2014). An express assumption of risk is the simplest application of the doctrine and "recognizes that, when a plaintiff makes an express statement that he is voluntarily accepting a specified risk, the plaintiff is barred from recovering damages for an injury resulting from that risk." *Id.* An

express assumption of risk "most often involves a written waiver or release by the would-be plaintiff." *Id.* Further, "in an 'express assumption of the risk' case, the plaintiff's consent relieves the defendant of any duty to protect the plaintiff from injury." *Id.* at 193.

¶ 77 "Although exculpatory clauses in contracts releasing an individual from his or her own future negligence are disfavored, they are not prohibited as against public policy." *Alack v. Vic Tanny International of Missouri, Inc.*, 923 S.W.2d 330, 334 (Mo. 1996). "[C]ontracts exonerating a party from acts of future negligence are to be 'strictly construed against the party claiming the benefit of the contract, and clear and explicit language in the contract is required to absolve a person from such liability.' " *Id.* (quoting *Hornbeck v. All American Indoor Sports, Inc.*, 898 S.W.2d 717, 721 (Mo. Ct. App. 1995)). Missouri law requires "clear, unambiguous, unmistakable, and conspicuous language in order to release a party from his or her own future negligence," and "[g]eneral language will not suffice." *Id.* at 337. " 'The words "negligence" or "fault" or their equivalents must be used conspicuously so that a clear and unmistakable waiver and shifting of risk occurs. There must be no doubt that a reasonable person agreeing to an exculpatory clause actually understands what future claims he or she is waiving.' " *Holmes v. Multimedia KSDK, Inc.*, 395 S.W.3d 557, 560-61 (Mo. Ct. App. 2013) (quoting *Alack*, 923 S.W.2d at 337-38).

¶ 78 Additionally, "[o]nly parties to a contract and any third-party beneficiaries of a contract have standing to enforce that contract." *Verni v. Cleveland Chiropractic College*, 212 S.W.3d 150, 153 (Mo. 2007). To be deemed a third-party beneficiary, the terms of the contract must clearly express intent to benefit the third party or an identifiable class of which the third party is a member. *Id.* When an express declaration of intent is lacking, a strong presumption exists " 'that the third party is not a beneficiary and that the parties contracted to benefit only themselves.' " *Id.* (quoting *Nitro Distributing, Inc. v. Dunn*, 194 S.W.3d 339, 345 (Mo. 2006)).

¶ 79 In Missouri, the primary rule of contract interpretation is to determine and give effect to the intent of the parties. *State ex rel. Pinkerton v. Fahnestock*, 531 S.W.3d 36, 44 (Mo. 2017). Intent is determined by considering the plain and ordinary meaning of the contract language. *Id.* Each clause in a contract should be read in the context of the contract as a whole, and any interpretation that would render a provision meaningless should be avoided. *Id.* Additionally, the parties' intentions should be "gleaned from the four corners of the contract" unless the contract is ambiguous, in which case a court may resort to considering extrinsic evidence. *Kansas City N.O. Nelson Co. v. Mid-Western. Construction Co. of Missouri, Inc.*, 782 S.W.2d 672, 677 (Mo. Ct. App. 1989).

¶ 80 Additionally, whether a contract is ambiguous presents a question of law. *Alack*, 923 S.W.2d at 334. " 'An ambiguity arises when there is duplicity, indistinctness, or uncertainty in the meaning of the words used in the contract.' " *Id.* at 337 (quoting *Rodriguez v. General Accident Insurance Co. of America*, 808 S.W.2d 379, 382 (Mo. 1991)).

¶ 81 Here, plaintiff acknowledged signing the Release at issue upon her arrival at Cross Country. In fact, she signed three such Releases—one for herself and one for each of the two minors who accompanied her. The operative language of the Release is as follows:

> "4. I, for myself and on behalf of my heirs, assigns, personal representatives, and next of kin, HEREBY RELEASE, INDEMNIFY, AND HOLD HARMLESS CROSS COUNTRY TRAIL RIDE, LLC, officers, officials, agents and/or employees, *other participants*, sponsoring agencies, sponsors, advertisers, and, if applicable, owners and lessors of premises used for the activity ('Releasees'), WITH RESPECT TO ANY

AND ALL INJURY, DISABILITY, DEATH, or loss or damage to person or property associated with my presence or participation, WHETHER ARISING FROM THE NEGLIGENCE OF THE RELEASEES OR OTHERWISE, to the fullest extent permitted by law." (Emphasis added.)

Defendant maintains she was an intended third-party beneficiary of the Release in that she falls within the category of "other participants" and, as a result, plaintiff agreed to release her from liability for injuries plaintiff sustained while horseback riding at Cross Country, including those that occurred due to defendant's negligence.

¶ 82    Initially, plaintiff argues the Release fails to clearly express the intent to benefit defendant as a third party. To support this contention, she points to her own testimony that she "did not even know what she [was] signing" and the lack of testimony from anyone associated with Cross Country regarding their intent in entering the contract. Additionally, plaintiff maintains the phrase "other participants" is ambiguous and could be reasonably interpreted as a "catch-all term" that means " 'employees, agents, servants, and/or independent contractors of [Cross Country] who perform services which further [its] business' " and not, as defendant suggests, other paying customers who are similarly situated to plaintiff and defendant. We disagree and find the Release is unambiguous and clearly expresses an intent to benefit an identifiable class, *i.e.*, "other participants," of which defendant is a member.

¶ 83    Looking as we must at the four corners of the parties' agreement, it is clear that "other participants" were included within the list of individuals or entities to whom the parties to the agreement intended the release of liability to apply. In other words, there was an express intent to benefit "other participants" in the Release. Additionally, when looking at the agreement as a whole, it is clear that the phrase "other participants" refers to those individuals at Cross Country who were similarly situated to plaintiff and defendant, *i.e.*, paying customers or guests who were engaging in the activities provided or offered by Cross Country. Although the term "participants" is not defined in the Release, as defendant notes, the terms "participate," "participation," and "participants" are used throughout the document. Their use clearly reflects that these words were intended to refer to individuals visiting Cross Country for the purpose of engaging in its recreational activities, including horseback riding. The Release provides as follows:

"In consideration of being allowed to *participate* in any way, including but not limited to trail riding, competing, officiating, working for, recreating in any fashion while visiting Cross Country Trail Ride, LLC, and its trail ride program, its related events and activities, I *** the undersigned, acknowledge, appreciate, and agree that;

1. The risk of injury from the activities involved in this program is significant, including the potential for permanent paralysis and death, and while particular skills, equipment, and personal discipline may reduce the risk, the risk of serious injury does exist; and,

2. I KNOWINGLY AND FREELY ASSUME ALL SUCH RISKS, both known and unknown, EVEN IF ARISING FROM NEGLIGENCE OF THE RELEASEES or others, and assume full responsibility for my *participation*; and,

3. I willingly agree to comply with the stated and customary terms of *participation*. If, however, I observe any unusual significant hazard during my presence or *participation*, I will remove myself from *participation* and bring such to the attention of the Company immediately; and,

4. I, for myself and on behalf of my heirs, assigns, personal representatives, and next of kin, HEREBY RELEASE, INDEMNIFY, AND HOLD HARMLESS CROSS COUNTRY TRAIL RIDE, LLC, officers, officials, agents and/or employees, *other participants*, sponsoring agencies, sponsors, advertisers, and, if applicable, owners and lessors of premises used for the activity ('Releasees'), WITH RESPECT TO ANY AND ALL INJURY, DISABILITY, DEATH, or loss or damage to person or property associated with my presence or *participation*, WHETHER ARISING FROM THE NEGLIGENCE OF THE RELEASEES OR OTHERWISE, to the fullest extent permitted by law." (Emphases added.)

Additionally, signature lines on the Release required the "PARTICIPANT[']S SIGNATURE" or the signature of a parent or guardian for "PARTICIPANTS OF MINORITY AGE."

¶ 84　　During her own deposition, plaintiff acknowledged that the Release used the phrase "other participants" and that she would characterize defendant as "another participant" in the activities at Cross Country. We agree and find the language used in the Release is clear and that it unambiguously refers to an identifiable class of individuals that includes defendant.

¶ 85　　Plaintiff next argues the Release is deficient because it purported to relieve liability for nonreleasable claims, including "intentional torts, gross negligence, and/or activities involving the public interest." She notes language in the Release stated it applied to "THE NEGLIGENCE OF THE RELEASEES OR OTHERWISE." Plaintiff maintains the word "otherwise" encompasses those nonreleasable claims and, thus, renders the Release duplicitous, indistinct, uncertain, and ambiguous.

¶ 86　　To support her argument, plaintiff relies on *Lewis v. Snow Creek, Inc.*, 6 S.W.3d 388, 394 (Mo. Ct. App. 1999), involving an exculpatory clause that purported "to shield [a party] from 'any claim based on negligence and *** any claim based upon *** other legal theory.' " There, the reviewing court noted " 'there is no question that one may never exonerate oneself from future liability for intentional torts or for gross negligence, or for activities involving the public interest.' " *Id.* (quoting *Alack*, 923 S.W.2d at 337). It found that the exculpatory clause before it used general language by referencing claims based on " 'any *** other legal theory,' " stating such language included "intentional torts, gross negligence or any other cause of action not expressly listed." *Id.* Thus, because the contract at issue purported to relieve the respondent in the case of all liability but did not actually do so, it was duplicitous, indistinct, uncertain, and, ultimately, ambiguous. *Id.*

¶ 87　　We find *Lewis* distinguishable from the present case. The language there was much broader than the language of the Release that plaintiff signed. Unlike in this case, the exculpatory clause in *Lewis* expressly referred to legal theories other than negligence. Additionally, we note other courts applying Missouri law have suggested that the same language that is at issue in this case was sufficiently clear and unambiguous. See *Haines v. St. Charles Speedway, Inc.*, 689 F. Supp. 964, 969 (E.D. Mo. 1988) (finding a release was clear and unambiguous under Missouri law where it relieved liability for the "negligence of the Releasees or otherwise" (internal quotation marks omitted)); *Hornbeck v. All American Indoor Sports, Inc.*, 898 S.W.2d 717, 721 (Mo. Ct. App. 1995) (stating language that released claims " 'whether caused by the negligence of the releasees or otherwise' " would "clearly and unambiguously encompass[ ] the negligence of the party seeking to enforce the release" (quoting *Haines*, 689 F. Supp. at 969)). In this instance, the Release plaintiff signed used the term "negligence" and did not expressly include references to any "other legal theory." We

find the Release was sufficient to notify plaintiff that she was releasing "other participants" in trail riding activities at Cross Country from claims arising from the "other participant's" own negligence. See *Alack*, 923 S.W.2d at 337 ("The exculpatory language must effectively notify a party that he or she is releasing the other party from claims arising from the other party's own negligence.").

¶ 88    Finally, plaintiff also challenges the format of the Cross Country Release. Again, she relies on *Lewis*, wherein the court additionally found the exculpatory clause before it was not conspicuous and, thus, insufficient to provide notice of a release of liability for negligence claims. *Lewis*, 6 S.W.3d at 394-95. Specifically, the reviewing court noted the form at issue was titled as a "Rental Form" rather than a release, the form's exculpatory clause was in approximately five-point font at the bottom of the form, and the plaintiffs "had to sign the Rental Form to receive ski equipment and had to do so while in a line." *Id.*

¶ 89    Again, the present case is distinguishable. Here, the Release documents submitted by the parties consisted of two pages. As argued by defendant, the first page was separated into two equal parts. The top portion was labeled "Registration Form" and included several blank spaces for basic guest information. The bottom portion of the form was labeled "RELEASE OF LIABILITY—READ BEFORE SIGINING [*sic*]" and was separated from the top portion of the form by a dotted line. The titles of both documents appear to be in the same font size with the title of the Release being entirely capitalized. The release information is not relegated to only the bottom portion of the form but, instead, consists of several paragraphs and occupies half of the first page. Significant language in the Release is also capitalized for emphasis. The second page of the Release documents was similarly divided into two equal parts. However, both parts of the second page pertained to Cross Country's Release. Plaintiff signed the Cross Country Release three times, once for herself and once for each of the minors accompanying her. Further, we note that although plaintiff claims she did not read the release, she did acknowledge that she was required to sign similar documents during previous visits to Cross Country.

¶ 90    Here, we find the Release at issue was unambiguous and conspicuous such that it sufficiently informed plaintiff that she was releasing other individuals participating in Cross Country's trail riding activities—including defendant—from claims arising out of their own negligence. Plaintiff expressly assumed the risks associated with her horseback riding activities at Cross Country and, through the Cross Country Release she signed, relieved defendant of any duty to protect her from injury. Given the circumstances presented, the trial court committed no error in granting defendant's motion for summary judgment.

¶ 91    We note plaintiff has additionally argued on appeal that the trial court erred in granting summary judgment in defendant's favor under Missouri law because defendant's conduct was grossly negligent. She points out that, under Missouri law, "one may never exonerate oneself from future liability for intentional torts or for gross negligence, or for activities involving the public interest." *Alack*, 923 S.W.2d at 337. Further, plaintiff notes that in response to defendant's motion for summary judgment, she made the following argument: "There is a genuine issue of material fact as to whether Defendant acted grossly negligent in participating in a group trail ride with a sizeable group, including children, on a horse she did not trust, that had kicked one person prior, while intoxicated and riding too closely to Plaintiff."

¶ 92    In *DeCormier v. Harley-Davidson Motor Co. Group, Inc.*, 446 S.W.3d 668, 671 (Mo. 2014), the Missouri Supreme Court stated that it would "enforce exculpatory agreements to

protect a party from liability for their own negligence" and a plaintiff could not "avoid this rule by alleging [a defendant was] grossly negligent because Missouri courts do not recognize degrees of negligence at common law." Thus, it rejected the precise argument plaintiff has raised in this case both before the trial court and on appeal.

¶ 93 As plaintiff notes, Missouri does recognize a separate cause of action for recklessness. *Id.* at 671-72.

"Conduct is in reckless disregard of another if the actor:

'[A]ct[s] or fails to do an act which it is [the actor's] duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize that the actor's conduct not only creates an unreasonable risk of *** harm to the other but also involves a high degree of probability that substantial harm will result to [the other.]' [Citations.]" *Id.* at 672.

"[R]ecklessness is a distinct cause of action from negligence." *Throneberry v. Missouri State Highway Patrol*, 526 S.W.3d 198, 208 (Mo. Ct. App. 2017). "Recklessness looks to the tortfeasor's state of mind" and "is an aggravated form of negligence which differs in quality, rather than in degree, from ordinary lack of care." *Hatch v. V.P. Fair Foundation, Inc.*, 990 S.W.2d 126, 139 (Mo. Ct. App. 1999).

¶ 94 Under the circumstances presented here, plaintiff cannot rely on a claim of recklessness to avoid enforceability of the Release, as she did not raise the claim before the trial court. *SI Securities v. Bank of Edwardsville*, 362 Ill. App. 3d 925, 933, 841 N.E.2d 995, 1002 (2005) ("Issues not raised in a complaint and points not argued in the trial court are waived on appeal.").

¶ 95 Additionally, the record reflects defendant raised plaintiff's signing of the release and its express assumption of risk argument as an affirmative defense. In Missouri, "[t]o avoid an affirmative defense alleged in an answer, a plaintiff must plead specifically matters of affirmative avoidance." *Angoff v. Mersman*, 917 S.W.2d 207, 211 (Mo. Ct. App. 1996); see also *Warren v. Paragon Technologies Group, Inc.*, 950 S.W.2d 844, 845 (Mo. 1997) (stating that "[r]elease is an affirmative defense that must be pled in an answer" and once done requires a plaintiff to file a reply if he or she intends to assert an affirmative avoidance). "The plaintiff's reply should distinctly allege the grounds of avoidance," and "[m]atters of avoidance are not available to a party who does not plead them specifically." *Angoff*, 917 S.W.2d at 211. "An affirmative avoidance is waived if the party raising it has neglected to plead it." *Id.*

¶ 96 Here, plaintiff did not plead a cause of action based on "recklessness" either in her complaint or in responding to defendant's answer and motion for summary judgment. As defendant points out, she also did not seek to amend her original pleading to include a claim of recklessness. Accordingly, we find plaintiff's arguments are forfeited and do not preclude summary judgment in defendant's favor.

¶ 97                                    III. CONCLUSION
¶ 98 For the reasons stated, we affirm the trial court's judgment.

¶ 99 Affirmed.